**EXHIBIT**

**A**

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 4, 2025

Lyle W. Cayce
Clerk

—————————

No. 24-30674

—————————

In the Matter of the Complaint of Offshore Oil
Services, Incorporated, as owner of the M/V Anna M,
for Exoneration from of Limitation of Liability

Offshore Oil Services, Incorporated, as owner of the
M/V Anna M,

> *Petitioner—Third Party Plaintiff—Appellant*,

> *versus*

Island Operating Company, Incorporated,

> *Third Party Defendant—Appellee*,

> *versus*

Tyron Felix, Louisiana Workers Compensation
Corporation,

> *Claimants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1522

———————————————————

Before JONES and GRAVES, *Circuit Judges*, and RODRIGUEZ, *District Judge.*[†]

FERNANDO RODRIGUEZ, JR., *District Judge*:

This dispute concerns whether a contract governing the provision of services at an offshore oil and gas production platform is one in maritime. If not, Louisiana law controls, nullifying an indemnity provision within the contract, which the appellant seeks to enforce. We conclude that the contract is not maritime in nature. As a result, we AFFIRM summary judgment in favor of the appellee.

I.

Fieldwood Energy LLC is an oil and gas exploration and production company that owns and operates production platforms in the Gulf of Mexico. In 2014, Fieldwood and Island Operating Company, Inc. ("IOC") entered into a Master Services Contract, through which the latter provided workers to perform oil and gas production services on Fieldwood's platforms. The MSC defined "The Work" under the contract as those goods and services that Fieldwood requested, such as through work orders, and that were described in an Appendix. The referenced and incorporated Appendix listed many categories of possible works and services, most of which concerned traditional oil and gas production services, such as casing, explosives, well control, and pressure pumping. The form also contained the categories "Marine Aids to Navigation" and "Marine Vessels (Operation/Service/Repair)." In connection with the MSC, Fieldwood and IOC checked only the line for "Other (Please list)," and handwrote, "Lease

---

[†] United States District Judge for the Southern District of Texas, sitting by designation.

No. 24-30674

Operators." The boxes for the remaining categories of goods and services remained unchecked.

The MSC contemplated Fieldwood contracting with third parties to provide marine transportation for equipment and IOC workers to the offshore platforms:

> Whenever Work to be performed under this Contract involves worksites located offshore or within inland waters, [**Fieldwood**], unless otherwise agreed to in writing, **shall have the obligation to provide marine transportation for equipment and workers in association with such Work**, and may enter into agreements with third parties for the provision of the marine transportation services. **[Fieldwood] and [IOC] specifically agree that such transportation, whether provided by [Fieldwood] or [IOC], is a maritime activity and shall be subject to General Maritime Law of the United States of America at all times** while any member of [IOC] Group (as defined herein) is being transported to or from the worksite, **including, without limitation, while such member is embarking or disembarking** or while such equipment is being loaded or offloaded from any vessel(s).

MSC (emphasis added). Based on this provision, Fieldwood contracted with Offshore Oil Services, Incorporated ("OOSI") to transport IOC employees to the platforms.[1]

The MSC also established indemnity obligations. In particular, IOC agreed to indemnify Fieldwood's "third party contractors," such as OOSI, from and against claims resulting from injuries to IOC employees:

> [IOC] hereby agrees to release, indemnify, protect, defend and

---

[1] The precise contractual arrangements for the transportation were more complex and involved other parties. Those details, however, do not affect the analysis of the issues in this appeal.

> hold harmless such other third party contractor(s) [e.g., OOSI] (and any such third party contractor group) from and against any and all claims for (1) the injury, illness or death of any member of [IOC][.]

MSC (capitalization removed).

On December 16, 2020, Fieldwood and IOC entered into a Work Order via an email chain, through which Fieldwood asked IOC to provide additional workers to fill A Operator positions.[2] Stacy Fontenot, a Fieldwood corporate representative, described the roles and responsibilities of A Operators: "They do what's called the monthly BESE testing, compliance testing . . . well testing, take shakeouts, check chemical rates, start up compressors, load compressors, [and] bring wells online."

A critical issue in this lawsuit concerns whether vessels would play a substantial role in the performance of the MSC, and whether the parties expected as much. On these points, Fontenot was asked in a deposition whether under the MSC, A Operators could use equipment connected to a vessel. She responded that "[w]e typically don't do that, but it . . . has been done, yes, sir. I'd say it's part of the agreement." IOC's President and Chief Executive Officer, Greg Falgout, also commented on the issue, declaring that IOC production operators "performed no work upon . . . vessels." According to him, Fieldwood and IOC expected the use of vessels under the MSC solely as "a means of transportation to relocate production workers as necessary among the field platforms and/or to transport them back to shore." He stated that neither Fieldwood nor IOC "had any expectation of vessels being used as work platforms by IOC personnel for any work performed or

---

[2] The parties agree that the Work Order represents part of the contractual instrument in this matter. For ease of reference, the Court's use of "the MSC" includes the Work Order.

No. 24-30674

contemplated[.]"

Starting in December and in response to the Work Order, Fieldwood called upon OOSI to convey IOC workers to the platform. OOSI utilized the M/V Anna M for the services, and one of the transported workers was Tyrone Felix. He worked two 14-day hitches, first from December 31, 2020 through January 14, 2021, and then from January 28 through February 11.

During his 28 days of work, Felix performed production rounds checking equipment on the platforms, and conducting platform start-ups and Bureau of Safety and Environmental Enforcement inspections. On 10 of those days, he also moved potable water from the vessel to the platform, or offloaded and backloaded equipment to and from the vessel and the platform.

Near the beginning of his second hitch, on January 30, 2021, Felix sustained injuries while disembarking the M/V Anna M via a personnel basket transfer to the platform. Two weeks later, he sent OOSI a written claim letter related to his injuries.

In response to the demand letter, OOSI filed a Complaint for Exoneration from and/or Limitation of Liability pursuant to Federal Rule of Civil Procedure 9(h) and Supplemental Rule for Admiralty or Maritime Claims F. Within this limitation action, Felix filed a personal injury claim against OOSI.

In May 2022, OOSI initiated a Third-Party Demand against IOC, based on the indemnity provision within the MSC between IOC and Fieldwood. OOSI requested indemnification as to any recovery by Felix, additional insurance coverage as to Felix's claims, and the recovery of legal expenses incurred in connection with its defense against Felix's claims.

IOC moved for summary judgment. The parties agreed that the indemnity provision in the MSC required IOC to indemnify OOSI as to

No. 24-30674

Felix's personal injury claims against OOSI. IOC argued, however, that Louisiana law governed the matter, and that the Louisiana Oilfield Anti-Indemnity Act, La. R.S. 9:2780(B), (C) ("LOAIA") rendered the indemnity provision unenforceable. OOSI conceded that LOAIA precluded the enforceability of the indemnity provision, but contended that federal maritime law controlled, and that under maritime law, the indemnity provision remained valid.

In March 2023, the district court granted IOC's motion for summary judgment in part. The court concluded that Louisiana law governed the MSC, based on its findings that the MSC did not provide that vessels would play a substantial role in the completion of the contract, and that IOC and Fieldwood did not expect vessels to play such a role. Having concluded that Louisiana law controlled, the district court ruled that based on LOAIA, OOSI could not enforce the indemnity provision in the MSC.

The district court then denied summary judgment as to OOSI's request for recovery of defense costs. The anti-indemnity provision within LOAIA contains an exception regarding defense costs, permitting the recovery of such costs if the contractual language calls for such a recovery and the potentially-indemnified party is free from fault. *See Meloy v. Conoco, Inc.*, 504 So.2d 833, 834 (La. 1987). The district court found that a fact issue existed whether OOSI bore fault regarding Felix's injuries, requiring a trial.

In January 2024, as the parties prepared for trial, this Court issued *Earnest v. Palfinger Marine U.S.A., Inc.*, 90 F.4th 804 (5th Cir. 2024). The decision concerned whether federal maritime law or state law governed as to a Master Services Contract for work conducted on offshore platforms. Arguing that *Earnest* altered the relevant analysis, OOSI sought reconsideration of the district court's decision. The court denied the motion.

Before the trial commenced, OOSI and Felix settled. Based on that

6

No. 24-30674

event, IOC moved for summary judgment as to OOSI's remaining claim for defense costs, arguing that as no trial would occur, OOSI could not prove that it bore no fault as to Felix's injuries. The district court agreed and granted summary judgment in IOC's favor.

With all issues resolved, the district court in October 2024 entered a take-nothing judgment. OOSI timely appealed the district court's ruling granting summary judgment as to indemnity and insurance coverage.[3]

II.

"We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Huskey v. Jones*, 45 F.4th 827, 830 (5th Cir. 2022) (citation omitted). A court properly grants summary judgment if the movant shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

The determinative issue is whether federal maritime law or Louisiana state law applies to the MSC. If maritime law applies, then the MSC's provision requiring IOC to defend and indemnify OOSI is enforceable. If Louisiana state law applies, the Louisiana Oilfield Anti-Indemnity Act, La. R.S. 9:2780(B), (C), invalidates the contractual provision, and OOSI cannot seek indemnification or insurance coverage from IOC resulting from Felix's personal injury claims.

--------

[3] OOSI also requests reversal of the district court's "dismissal of OOSI's defense claim," but it presents no argument contesting the basis of the district court's decision—i.e., that OOSI's settlement with Felix precludes the company's recovery of defense costs. Thus, OOSI fails to present an issue on appeal that would require reversal of the district court's judgment on this issue. *See Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (finding that appellant's failure to identify any error in the district court's analysis is the same as if the appellant had not appealed that judgment).

No. 24-30674

Resolving the issue requires applying the choice of law analysis within the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356c ("OCSLA"). And under that analysis, the determinative question is whether federal maritime law applies of its own force to the MSC.

Federal admiralty law applies to "maritime contracts." *See Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 704 F.3d 350, 354 (5th Cir. 2013). "[W]hether a contract is maritime depends on 'the nature and character of the contract,' which focuses on whether it references 'maritime service[s] or maritime transactions.'" *Earnest*, 90 F.4th at 810. "This requires a 'conceptual rather than spatial approach,' under which we do not consider where formation or performance of the contract took place but instead evaluate the substance of the contract." *Id.* This Court's precedents "preclude[ ] the application of maritime law except in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction.'" *Id.* at 811 (quoting *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985)).

A two-part inquiry determines whether a contract such as the MSC constitutes a maritime or nonmaritime contract. *See In re Larry Doiron, Inc.*, 879 F.3d 568, 576 (5th Cir. 2018) (en banc). First, a court asks whether "the contract [is] one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" *Id.* If the court answers this question in the affirmative, the court then asks, "does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?" *Id.* An affirmative answer to both questions renders the contract one in maritime, subject to federal maritime law. *Id.* Under OCSLA, however, a negative answer to either question means that the laws of the adjacent state govern. 43 U.S.C. § 1333(a)(2)(A); *see also Grades Directional Drilling v. U.S. Turnkey Expl. Co.*, 98 F.3d 860, 865 (5th Cir. 1996)

8

(explaining that "OCLSA uses state law to fill gaps in federal law").

In the present matter, the parties do not dispute that the MSC represents a contract to provide services to facilitate the drilling or production of oil and gas on navigable waters. In other words, the district court correctly answered "yes" to the first question. Thus, the critical inquiry focuses on whether the MSC provided for or did IOC and Fieldwood expect that a vessel would play a substantial role in the completion of the contract.

The "focus" of the *Doiron* analysis "is on the contract and the parties' expectations, and the role of the vessel should be viewed in light of what is considered classically maritime." *Earnest*, 90 F.4th at 812; *see also In re Crescent Energy Servs., L.L.C. v. Carrizo Oil & Gas, Inc.*, 896 F.3d 350, 359 (5th Cir. 2018). Mere reference to vessels in the contract is insufficient; "there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry." *Earnest*, 90 F.4th at 810 (quoting 1 Benedict on Admiralty § 182 (Joshua S. Force & Steven F. Friedell eds., 2023)). Thus, "a contract to repair or to insure a ship is maritime, but a contract to build a ship is not." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) (citations omitted).

At times, "[t]he scope of the contract" and "the extent to which the parties expect vessels to be involved in the work" may be "unclear." *Doiron*, 879 F.3d at 577. "In resolving these issues, courts may permit the parties to produce evidence of the work actually performed and the extent of the vessel involvement in the job." *Id.*

Applying the principles in *Doiron* and *Earnest* to the present case, this Court concludes that the MSC represents a nonmaritime contract. The contract's terms do not provide that vessels would play a substantial role in

9

the completion of the work. The MSC defines the "Work and Services" only as "Lease Operators." Notably, the parties did not check the category, "Marine Vessels (Operation/Service/Repairs)." And the Work Order adds little detail, requesting "A Operators." Industry officials confirmed that such workers performed "compliance testing [such as] well testing, take shakeouts, check chemical rates, start up compressors, load compressors, [and] bring wells online." These responsibilities neither involved vessels nor represented traditional maritime work. *See Thibodeaux v. Grasso Prod. Mgmt. Inc.*, 370 F.3d 486, 493 (5th Cir. 2004) (citing *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 423–24 (1985)) ("Both this court and the Supreme Court have expressed the opinion that work commonly performed on oil production platforms is not maritime in nature."). Thus, the language of the MSC did not provide that vessels would play a substantial role in the completion of the contract.

It is true that the MSC required Fieldwood "to provide marine transportation for equipment and workers" when the work was located offshore or within inland waters, and that this contractual language expressly referenced "vessels." The provision, however, unambiguously concerned transporting workers to the job site—i.e., the platform—and did not represent a description of the actual work that the MSC contemplated. As a general rule, the *Doiron* analysis does not take into account vessels used to merely transport workers from the shore to a platform. *See Doiron*, 879 F.3d at 576 n.47. And IOC offers no compelling argument warranting an exception to this principle.[4]

---

[4] The transportation provision purported to render general maritime law applicable to such transportation. This Court has found that choice of law provisions within contracts such as the MSC do not control. *See Snyder Oil Corp. v. Samedan Oil Corp.*, 208 F.3d 521,

No. 24-30674

As for the expectations of the parties, the record conclusively demonstrates that IOC and Fieldwood did not expect that vessels would play a substantial role in the completion of the MSC. In particular, Gregg Falgout, IOC's president and CEO, explained that the use of vessels was only contemplated as a means of transportation to and from the platform and shore. He unambiguously declared that neither Fieldwood nor IOC "had any expectation of vessels being used as work platforms by IOC personnel for any work performed or contemplated[.]" As for Fieldwood's expectations, its corporate representative acknowledged that in connection with the MSC, operators had used equipment connected by lines to a vessel. But he explained that "[w]e typically don't do that[.]" His testimony is no evidence that Fieldwood expected that vessels would play a substantial role in the completion of the MSC. In other words, the fact that vessels could play an atypical role in the completion of a contract cannot create a fact issue that the parties expected that vessels would play a substantial role in completing the work. Overall, based on the record, the evidence conclusively demonstrates that the parties did not expect vessels to play such a role.

OOSI argues that the district court erred by not considering whether vessels actually played a substantial role in the completion of the contract. Specifically, OOSI claims that the district court failed to account for *Earnest* and incorrectly relied on the location of the work, rather than focusing on the overarching consideration of whether it was contemplated that a vessel would be necessary to perform the job. OOSI points out that on one-third of Felix's work days (i.e., 10 out of 28 days), he loaded and unloaded equipment from a vessel to the platform and transferred potable water from the M/V Anna M

---

523 (5th Cir. 2000) (citing *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990)). OOSI does not dispute this principle.

No. 24-30674

onto the platform. Doing so inherently rendered a vessel necessary to perform the work, contends OOSI.

OOSI's argument is not persuasive. As an initial matter, under *Earnest*, the actual use of vessels in completing a contract may play a role when the expectations of the parties or the terms of the contract remain "unclear." Here, the contractual terms and the expectations of the parties proved clear, rendering consideration of the actual use of vessels unnecessary.

Moreover, even when the consideration of such evidence becomes necessary, the actual use of vessels only represents information that a court considers to determine the parties' expectations or whether the contract required that vessels play a substantial role in the completion of the work. The actual use of vessels does not represent a distinct test in itself. Here, while transferring equipment and water from a vessel to a platform is "classically maritime," *see Hamm v. Island Operating Co.*, 450 F. App'x 365, 368 (5th Cir. 2011), the fact that Felix occasionally performed this work does not alter the language of the contract, which makes no mention of such work. And Felix's performance of some duties involving a vessel does not concern Fieldwood's and IOC's expectations of the work contemplated by the contract. At best, Felix's actual work on vessels is consistent with the testimony by Fieldwood's corporate representative, acknowledging that completion of the contract could, at times, involve a vessel. But he clarified that such work was atypical. And OOSI presents no evidence showing that Felix's unloading of equipment and potable water from a vessel constituted a substantial portion of his work day, or that when he performed such tasks, he was fulfilling a traditional role as an A Operator. The summary judgment evidence demonstrates, at most, that any use of vessels was incidental to the work contemplated by the MSC.

No. 24-30674

Comparing *Doiron* and *Earnest* to the present case proves illustrative and supports the Court's conclusion. *Doiron* concerned a MSC and an oral work order between Apache Corporation and Specialty Rental Tools & Supply, LLP ("STS"). The contract required performance of "flow-back" services to remove obstructions hampering a gas well in Louisiana's navigable waters. *Doiron*, 879 F.3d at 569–70. "The work order did not require a vessel, and neither Apache nor STS anticipated that a vessel would be necessary to perform the job." *Id.* at 570. During the work, however, the STS crew determined that it required heavy equipment to complete the work. *Id.* As a result, Apache contracted with Larry Doiron, Inc. to provide a barge with a crane to lift equipment onto the stationary platform. At one point, the STS and Doiron crews began removing equipment from the barge to the platform with the aid of the crane on the barge. During this process, the crane struck and injured one of the STS crewmembers. Doiron initiated a limitation of liability action. Based on the indemnity provision in the MSC between STS and Apache, Doiron, as a third-party contractor, sought indemnity from STS as to any damages recovered by the injured crewmember from Doiron.[5]

This Court concluded that the contract was nonmaritime because it did not provide for and the parties did not anticipate that a vessel would play a substantial role in the completion of the work. The work order "called for STS to perform downhole work on a gas well that had access only from a platform." *Id.* at 577. The use of a vessel (i.e., the barge) arose only after "the crew encountered an unexpected problem[.]" *Id.* "The use of the vessel to

---

[5] In both *Doiron* and *Earnest*, as in the present case, the parties agreed that if the contract at issue was deemed a maritime contract, federal maritime law would permit enforcement of the indemnity provision. If Louisiana law applied, the LOAIA would negate the indemnity provision.

No. 24-30674

lift the equipment was an insubstantial part of the job and not work the parties expected to be performed." *Id.* Given these facts, the Court deemed the MSC a nonmaritime contract subject to Louisiana law. And under LOAIA, Doiron could not enforce the indemnity provision in the MSC.

In *Earnest*, this Court considered whether "a contract to inspect and repair lifeboats on an oil platform located on the Outer Continental Shelf [constituted] a maritime contract[.]" *Earnest*, 90 F.4th at 806. Shell Oil Company (and a related company) owned and operated an Auger Tension Leg Platform off the Louisiana coast. The Auger contained ten lifeboats that Shell had to maintain in good working order. Shell entered into a Purchase Contract with Palfinger Marine, USA, through which Palfinger agreed "to provide annual inspections, maintenance, repairs of the lifeboats, and '5 year reoccurring cable change outs' of the davit systems used to launch the lifeboats from the platform." *Id.* at 807. On one occasion, Palfinger inspected Lifeboat 6, performing the work from the platform and inside the lifeboat. "A few weeks later, Shell conducted a quarterly drill of several lifeboats, including Lifeboat 6." *Id.* The launch of the lifeboat proceeded successfully, but during its recovery, the corroded release cable on Lifeboat 6 failed, causing the lifeboat to fall 80 feet into the water, killing two and injuring a third oil rig worker. In a lawsuit brought by the injured worker and the families of the deceased workers, Palfinger sought indemnity from Shell. The district court granted partial summary judgment in Shell's favor, based on its application of the *Doiron* test and its conclusion that the Purchase Contract represented a nonmaritime contract. *Id.* at 808.

This Court reversed. The Court concluded that the district court incorrectly considered the location of the work—i.e., on a platform or in a lifeboat. A "spatial analysis . . . is inapplicable[.]" *Id.* at 813. "Instead, the 'nature and character' of the contract is for the repair and maintenance of vessels necessary to support offshore drilling and production of oil and gas,

*i.e.*, maritime commerce." *Id.* The Court then disagreed with the district court's finding that the vessels were incidental to the performance of the contract. The Court reasoned that the "inspection, repair, and maintenance of the lifeboats are the reason for the purchase order under the Purchase Contract." *Id.* "A contract for maintenance and repair of a vessel inevitably gives the vessel a substantial role." *Id.* Finally, the Court rejected the district court's reliance on the fact that the lifeboats themselves were not engaged in maritime commerce. "Regardless of whether employing a lifeboat as a lifeboat means its passengers are engaged in maritime activity, the lifeboats are a required component of 'drilling and production of oil and gas on navigable waters from a vessel[, which] is commercial maritime activity.'" *Id.* (quoting *Doiron*, 879 F.3d at 575). The Court explained that none of its cases has "required that the vessel itself be engaged in maritime commerce." *Id.* Based on its conclusion that the Purchase Contract represented a maritime contract, the Court concluded that general maritime law applied. The Court reversed summary judgment and remanded to the district court for further proceedings.

The facts in the present case resemble more closely those involved in *Doiron* than in *Earnest*. As in the former, the MSC here did not expressly provide for the use of vessels or give vessels any role, other than for transportation to and from the platforms. In contrast, *Earnest* involved a contract "for the repair and maintenance of vessels necessary to support offshore drilling and production of oil and gas, *i.e.*, maritime commerce." *Earnest*, 90 F.4th at 813. Such services, reasoned the Court, "inevitably gives the vessel a substantial role." *Id.* The MSC between IOC and Fieldwood contemplated no requirements resembling such work, but instead called for services traditionally related to oil and gas production and considered nonmaritime, even when conducted on an offshore platform. It is true that the role of the vessel in *Doiron* arose unexpectedly, whereas in the present

No. 24-30674

matter, the transfer of potable water and equipment between a vessel and the platform represented, at least to IOC, an anticipated task, albeit an atypical one. But this distinction does not change the analysis. The fact that parties operating under a contract for nonmaritime services can require employees to conduct atypical and incidental vessel-related maritime tasks does not create a maritime contract.

### III.

For these reasons, this Court concludes that the MSC represented a nonmaritime contract subject to Louisiana law. Based on this conclusion, OOSI cannot enforce the indemnity provision within the contract.

We AFFIRM summary judgment in favor of IOC.

16