UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: WHITNEY OIL & GAS LLC

CIVIL ACTION

NO: 22-3015

SECTION: "H"

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the aftermath of Hurricane Ida, Petitioner Whitney Oil & Gas, LLC ("Whitney Oil") deployed its own operators and contract operators from Quality Process Services, LLC ("QPS") to check wells. On the morning of September 27, 2021, Claimant Kerri Espadron, a production operator for Whitney Oil, and Wyatt Boone, a production operator from QPS, departed in the field boat M/V LIL RED to check wells. Boone subsequently drove the boat into a well jacket, injuring Espadron. Whitney Oil filed this action for limitation or exoneration of liability for the accident. Espadron filed a claim in the limitation action against Whitney Oil and brought a third-party claim against QPS for his injuries. QPS filed a claim in the limitation action, asserting that Whitney Oil owes it defense and indemnity for Espadron's claims pursuant to the Master Service Agreement ("MSA") between the parties. Prior to trial, Espadron settled his personal injury claim. This Court held a bench trial on August 13, 2025 on QPS's indemnity claim against Whitney Oil. Having considered the

1

evidence admitted at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## FINDINGS OF FACT

1. At all material times, Whitney Oil & Gas, LLC ("Whitney Oil"), an oil and gas exploration and production company, owned and operated various oil fields located off the coast of Louisiana in both state and federal waters.
2. At all material times, Quality Process Services, LLC ("QPS") was an oilfield service provider that supplied personnel to oil and gas companies operating in the Gulf of Mexico.
3. At all material times, Kerry Espadron was employed by Whitney Oil as a production operator and was acting in the course and scope of his employment. Espadron was assigned to Whitney Oil's East Bay Field.
4. At all material times, Wyatt Boone, a contract production operator, was employed by QPS and was acting in the course and scope of his employment with QPS. Boone was assigned to Whitney Oil's East Bay Field.
5. On September 27, 2021, Boone was operating the M/V LIL RED, a vessel owned by Whitney Oil, and Espadron was a passenger when the vessel was involved in an allision, and Espadron was injured.
6. On January 6, 2016, Whitney Oil entered into a Master Services Agreement ("MSA") with QPS, which was effective at the time of the allision.
7. The MSA does not define the scope of work anticipated by QPS or indicate how vessels would be involved in the completion of the work.

8. The MSA obligates QPS to procure marine insurance only "where the Work involves the use of Vessels or marine equipment."
9. The MSA requires that work orders be in writing.
10. Besides the MSA, no separate work orders or other written agreements were entered into between Whitney Oil and QPS.
11. Both parties understood that QPS's obligation under the MSA was to provide contract personnel to assist in the production of oil and gas.
12. Pursuant to the MSA, QPS supplied personnel to work in Whitney Oil's oil fields, including production operators, mechanics, and cooks. QPS did not supply vessel captains.
13. More than 50 percent of the workers provided by QPS were production operators.
14. The Court accepts the testimony of Kyle Domangue, QPS's corporate representative, who testified that when it entered into the MSA with Whitney Oil, QPS expected that the production operators it supplied would be operating vessels and working in an area that could only be accessed by vessel.
15. QPS procured marine insurance because it anticipated that its production operators would be operating vessels.
16. The Court accepts the testimony of Kyle Bordelon, Whitney Oil's corporate representative, who testified that the QPS production operators utilized vessels as transportation to get from one well or platform in the oil field to another. He testified that given the nature of the production operators' duties, Whitney Oil anticipated that QPS personnel would operate its vessels for this purpose.
17. Whitney Oil and QPS did not have a shared expectation that vessels would play a substantial role in the completion of work under the MSA

other than for transportation to Whitney Oil's central facility and satellite platforms and wells.

18. All of the workers supplied by QPS were transported to Whitney Oil's central facility by vessel. The cooks and mechanics supplied by QPS remained at the central facility throughout their shift.
19. QPS production operators performed tasks related to the maintenance of the oil and gas wells at Whitney Oil's central facility and the satellite platforms and wells in Whitney Oil's oil fields.
20. Production operators needed to use a vessel to get to the satellite platforms and wells to perform their duties.
21. QPS production operators often operated Whitney Oil's vessels as part of their job duties.
22. QPS production operators were required to complete a boating safety course but did not have Coast Guard licenses.
23. The Court found the testimony of Clayton Holmes, a field foreman with Whitney Oil and the person-in-charge at the facility, regarding the duties of the production operators to be most credible.
24. All tools needed by the production operators were stored on and transported by vessel, including totes of chemicals.
25. The tasks required of the production operators—including changing valves, checking that wells are flowing, blowing out fueled pods, checking the blow cases for fluid, and changing charts—could not be performed from the vessel. Rather, the operators had to tie the vessel up to the well, exit the vessel with their tools, and climb onto the platform or well jacket to perform their work.
26. On rare occasions, the vessels were used as a work platform to work on the wells.

27. The production operators performed pollution checks by looking for sheens on the water while traveling between well jackets and platforms.
28. Vessels were necessary to the completion of the tasks required of production operators for transportation of tools and personnel to and from wells and platforms.
29. QPS production operators working in Whitney Oil's oil fields spent between 15 and 20 percent of their time aboard vessels under normal circumstances. The remainder of the time was spent on platforms and wells performing their duties.
30. When the oil field was shut in, such as after Hurricane Ida, the production operators spent more time on vessels doing pollution checks, which took approximately two hours to complete and could be completed from the vessel.
31. At the time of Espadron's injury, the oil field was shut-in because of damage to the facility caused by Hurricane Ida.
32. On the verbal direction of Whitney Oil supervisors, Espadron and Boone were completing a pollution check when the allision occurred.
33. The responsibilities of the QPS production operators were not traditional maritime work. *See Offshore Oil Servs., Inc. v. Island Operating Co., Inc.*, No. 24-30674, 2025 WL 2541914, at *5 (5th Cir. Sept. 4, 2025) ("Both this court and the Supreme Court have expressed the opinion that work commonly performed on oil production platforms is not maritime in nature.").
34. The parties did not present evidence regarding whether the majority of the performance called for under the MSA was to be performed in state waters or on OCSLA situses.

35. The MSA between Whitney Oil and QPS contains provisions requiring Whitney Oil to defend, indemnify, and hold QPS harmless from any personal injury claims brought by Whitney Oil employees regardless of QPS's fault.
36. QPS submitted a demand for defense, indemnity, and insurance coverage to Whitney Oil with respect to Espadron's claims against QPS.
37. Whitney Oil denied QPS's demand on the basis that the defense, indemnity, and insurance provisions of the MSA are void and unenforceable under the Louisiana Oilfield Anti-Indemnity Act.
38. Article 9.1 of the MSA dictates that general maritime law governs the interpretation of the MSA and the relationship of the parties. It also provides that, where general maritime law is determined to be inapplicable or incorporates state law, Louisiana state law applies.
39. QPS did not pay a *Marcel* premium.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this admiralty claim pursuant to 28 U.S.C. § 1333, and Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."
2. The issue before this Court is whether general maritime or Louisiana law apply to the MSA.
3. The choice-of-law provision in the MSA selecting general maritime law is unenforceable. "[I]f the contract is nonmaritime, Louisiana law will govern its construction even in the face of a choice-of-law clause. This is so because enforcement of the choice-of-law clause would violate Louisiana's public policy and directly contravene [the Louisiana Oilfield

Anti-Indemnity Act ("LOAIA")]." *In re Larry Doiron, Inc.*, 879 F.3d 568, 571 (5th Cir. 2018). Indeed, Fifth Circuit precedent "precludes the application of maritime law except in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction." *Earnest v. Palfinger Marine U S A, Inc.*, 90 F.4th 804, 811 (5th Cir. 2024). Further, "[b]oth federal and Louisiana state courts routinely disregard choice-of-law provisions in master service contracts when OCSLA requires the application of adjacent law." *Cardoso-Gonzalez v. Anadarko Petroleum Corp.*, 326 F. Supp. 3d 273, 281 (E.D. La. 2018)

4. In determining what law applies, "courts should consider not only general master agreements, but also more specific work orders or bids." *Matter of Aries Marine Corp.*, No. CV 19-10850, 2023 WL 1768361, at *6 (E.D. La. Feb. 3, 2023).

5. Although the parties did not provide this Court with sufficient evidence to determine whether the MSA should be governed by state law or OCSLA, the Court finds that its conclusion would be the same under either law. "[A] contractual indemnity claim (or any other contractual dispute) arises on an [Outer Continental Shelf Lands Act ("OCSLA")] situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A)." *Grand Isle Shipyard, Inc. v. Seacor Marine*, LLC, 589 F.3d 778, 787 (5th Cir. 2009). To determine whether OCSLA requires application of the adjacent state's law, courts consider a three-part test: "(1) The controversy must arise on a situs covered by the OCSLA (i.e. the subsoil seabed, or artificial structure

7

permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with federal law." *Matter of Offshore Oil Servs., Inc.*, 663 F. Supp. 3d 594, 610 (E.D. La. 2023). For the following reasons, federal maritime law does not apply of its own force. Further, the Fifth Circuit has consistently held that LOAIA does not conflict with federal law. *Id.* at 616; *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir. 1986). Therefore, assuming the situs requirement is met, the law of the adjacent state—here, Louisiana—would apply through OCSLA.

6. Accordingly, the issue before the Court is whether the MSA is a maritime contract and therefore governed by general maritime law, or whether the MSA is a non-maritime contract governed by Louisiana law. Whether "a contract is maritime depends on 'the nature and character of the contract,' which focuses on whether it references 'maritime service[s] or maritime transactions.'" *Earnest*, 90 F.4th at 810.

7. The test for determining whether a contract is maritime, set forth by the Fifth Circuit in *In re Larry Doiron, Inc.*, requires the Court to answer two questions: (1) "is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" and (2) "does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?" 879 F.3d 568, 576 (5th Cir. 2018).

8. The Court finds, and the parties agree, that the answer to the first question in the *Doiron* test is yes.

9. Accordingly, the Court must consider the second question. "[T]he *Doiron* test determines whether maritime law applies of its own force through

a contract bearing the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction. The focus of this analysis is on the contract and the parties' expectations, and the role of the vessel should be viewed in light of what is considered classically maritime." *Earnest*, 90 F.4th at 812.

10. "Mere reference to vessels in the contract is insufficient; 'there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry.'" *Offshore Oil Servs., Inc*, 2025 WL 2541914, at *5 (quoting *Earnest*, 90 F.4th at 810).

11. However, where "[t]he scope of the contract [is] unclear; [or] the extent to which the parties expect vessels to be involved in the work [is] unclear . . . courts may permit the parties to produce evidence of the work actually performed and the extent of vessel involvement in the job." *Doiron*, 879 F.3d at 577.

12. "[T]he actual use of vessels only represents information that a court considers to determine the parties' expectations or whether the contract required that vessels play a substantial role in the completion of the work." *Offshore Oil Servs., Inc.*, 2025 WL 2541914, at *6.

13. "'When work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract.' *Doiron* suggests that a rule of thumb similar to the thirty-percent guideline in Jones Act cases might be useful." *Barrios v. Centaur, L.L.C.,* 942 F.3d 670, 681 (5th Cir. 2019) (quoting *Doiron*, 879 F.3d at 576 n.47). However, "[e]ven significant vessel involvement isn't enough if that involvement was unexpected." *Id.*

14. "The Fifth Circuit has clarified that the role of a vessel as transportation to and from the job site is irrelevant in this analysis. Additionally, the fact that the claimants were allegedly injured while aboard the vessel is not dispositive." *Matter of Aries Marine Corp.*, No. CV 19-10850, 2023 WL 1768361, at *5 (E.D. La. Feb. 3, 2023).
15. A vessel's role in housing and transporting tools and equipment that are later transferred to the Platform is insubstantial. *Genesis Energy, L.P. et al. v. Danos, LLC*, No. CV 24-20357, at *10–11 (5th Circ. 2025).
16. "A vessel's being indispensable may not equate to its role being 'substantial.'" *In re Crescent Energy Servs., L.L.C. for Exoneration from or Limitation of Liab.*, 896 F.3d 350, 361 (5th Cir. 2018).
17. The Court finds that the answer to the second question in *Doiron* is "no."
18. Because the MSA does not provide the scope of work and there are no additional work orders, the contract between the parties is unclear as to whether a vessel will play a substantial role in the completion of the contract.
19. In light of the testimony regarding the anticipated work to be provided by QPS's contract workers and the involvement of vessels in that work, the parties did not have a shared expectation that a vessel would play a substantial role in the completion of the contract beyond transportation to wells and platforms in the oil field.
20. Even assuming that the parties' expectation of the contract was unclear, the actual use of vessels supports a finding that this contract is non-maritime. The use of vessels was primarily for transportation, and other uses—such as for temporary work platforms or pollution checks when the facility was shut-in—were atypical and incidental to the work contemplated by the agreement. While these ancillary functions of the

vessels may have facilitated completion of the contract, "*Doiron* calls for a closer nexus between the Vessel and the project's work than these functions have." *Genesis Energy, L.P., LLC*, No. CV 24-20357, at *13.

21. "The fact that parties operating under a contract for nonmaritime services can require employees to conduct atypical and incidental vessel-related maritime tasks does not create a maritime contract." *Offshore Oil Servs., Inc.*, 2025 WL 2541914, at *8.

22. Accordingly, the MSA is a non-maritime contract.

23. Louisiana law applies to the MSA either by its own force or through OCSLA.

24. The Louisiana Oilfield Anti-Indemnity Act ("LOAIA") provides that:

> Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals . . . is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee . . . .

25. The Fifth Circuit has espoused a two-part inquiry to determine whether LOAIA applies to a contract. First, there must be an agreement that "pertains to" an oil, gas or water well, and second the agreement must be "related to exploration, development, production, or transportation of oil, gas, or water." *Transcon. Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992).

26. It is undisputed that the MSA pertains to a well within the meaning of LOAIA and is related to exploration, development, production, or transportation of oil, gas, or water. Accordingly, LOAIA applies to the MSA.

27. Because QPS did not pay a *Marcel* premium, the exception to LOAIA set out by the Fifth Circuit in *Marcel v. Placid Oil Co.*, 11 F.3d 563, 569 (5th Cir. 1994), does not apply.
28. LOAIA precludes QPS from enforcing the indemnity provision in the MSA, and Whitney Oil does not owe defense, indemnity, or insurance coverage to QPS for the claims of Kerri Espadron.

## CONCLUSION

For the foregoing reasons, all claims by QPS against Whitney Oil are **DISMISSED WITH PREJUDICE**. Judgment shall issue in Whitney Oil's favor.

New Orleans, Louisiana this 22nd day of September, 2025.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**